ROACH, LEITE & MANYIN, LLC
2938 Levick Street, Ground Floor
Philadelphia, PA 19149
By: Marirose E. Roach, Esquire
Attorney Identification No. 205225
marirose@rlmfirm.com
office: (267) 343-5818
fax: (215) 405-3765

UNITED STATES DISTRICT COURT
EASTERN DISTRICT COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Marc Stein d/b/a 626 FRONT LLC | : | |
| a.k.a. AURA RESTAURANT & LOUNGE | : | No. |
| 626-628 North Front Street | : | |
| Philadelphia, PA 19123 | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Complaint for Damages |
| | : | |
| CITY OF PHILADELPHIA | : | |
| Law Department | : | |
| One Parkway | : | |
| 1515 Arch St., | : | |
| Philadelphia PA 19102-1595 | : | |
| | : | |
| and | : | |
| | : | |
| CITY OF PHILADELPHIA POLICE | : | |
| DEPARTMENT | : | |
| 750 Race St., | : | |
| Philadelphia PA 19106 | : | |
| | : | |
| and | : | |
| | : | |
| SERGEANT MICHAEL BRENNAN | : | |
| 750 Race St., | : | |
| Philadelphia PA 19106 | : | |
| | : | |
| and | : | |
| | : | |

CAPTAIN BRIAN KORN                  :
750 Race St.,                      :
Philadelphia PA 19106              :
                                   :
                                   :
            and                    :
                                   :
NORTHERN LIBERTIES                 :
NEIGHBORHOOD ASSOCIATION :
NLNA Community Center              :
700 N. 3rd St., 19123             :
Philadelphia, PA                   :
                                   :
            and                    :
                                   :
DAVID WITZ                         :
511 Montrose st.,                  :
Philadelphia PA 19147              :
                                   :
            and                    :
                                   :
MATT RUBEN                         :
NLNA Community Center              :
700 N. 3rd St., 19123             :
Philadelphia, PA                   :
                                   :
            and                    :
                                   :
LARRY FREEDMAN                     :
NLNA Community Center              :
700 N. 3rd St., 19123             :
Philadelphia, PA                   :
                                   :
            and                    :
                                   :
JUDY DONOVAN                       :
117 Fairmount Ave.,               :
Philadelphia PA 19123              :
                                   :
            and                    :
                                   :
RICHARD DONOVAN                    :
117 Fairmount Ave.,               :
Philadelphia PA 19123              :

and                                             :
                                                :
                                                :
JAMES BROSSY                                    :
106 Fairmount Ave.,                             :
Philadelphia PA 19123                           :
                                                :
        and                                     :
                                                :
DEBBIE RUDMAN                                   :
106 Fairmount Ave.,                             :
Philadelphia PA 19123                           :
                                                :
        and                                     :
                                                :
CHRISTOPHER SAWYER                              :
d/b/a PHILADELINQUINCY                          :
and PHILADELINQUINCY                            :
2434 East Cumberland Street                     :
Philadelphia, PA 19125                          :
                                                :
                                                :
        and                                     :
                                                :
PHILEBRITY.COM                                  :
1021 N. Hancock #1,                             :
Philadelphia PA 19123                           :
                                                :
                                                :
_____        :


## COMPLAINT

Plaintiff states as follows:

## JURISDICTION AND VENUE

1.      Jurisdiction is conferred upon this Court pursuant to *28 U.S.C.A. § 1331* and *28 U.S.C.A. §*

*1343* because the matters in controversy arise under the Constitution and laws of the United States.

This Court has supplemental jurisdiction to hear the state claims of Marc Stein, d/b/a 626 Front LLC also known as Aura Restaurant & Lounge, ("Plaintiff") under *28 U.S.C.A. § 1367(a)*.

2.      Jurisdiction also is conferred upon this Court pursuant to *28 U.S.C.A. § 1332* because the matter in controversy, exclusive interest and costs, exceeds the sum of $75,000.

3.      Venue is proper in this Court under *28 U.S.C.A. 1391(b)* because a substantial part of the events that gave rise to Plaintiff's claims took place and all defendants reside within the Eastern Division of the District of Pennsylvania.

## PRELIMINARY STATEMENT

4.      This is an action at law to redress the deprivation under color of statute, ordinance, regulation, custom, or usage of a right, privilege and immunity secured to Plaintiff by the First and Fourteenth Amendments to the Constitution of the United States, *42 U.S.C. §§1983* and *1981*, and arising under the law and statutes of the Commonwealth of Pennsylvania.

5.      This action is against the defendant, City of Philadelphia, located in the County of Philadelphia, Commonwealth of Pennsylvania, Eastern District of Pennsylvania.

6.      This action is also against the defendant, City of Philadelphia Police Department, its agents, servants and employees, including but not limited to Sgt. Brennan and Captain Korn, who were at all times material hereto, elected and/or duly appointed, employed and acting as officers of the law in the City of Philadelphia. Said agents, servants and/or employees are being sued both in their individual and official capacities.

7.      There are further causes of action stated herein against private defendants, not directly associated with and/or employed by the City of Philadelphia, as will be set forth at length herein.

8.     It is alleged, among other things, that the private defendants conspired with the City of

Philadelphia, City of Philadelphia Police Department and their agents, servants and employees, to be

maliciously and purposefully deprived if its aforesaid protected rights under the Constitution of the

United States, and the laws and statutes of the Commonwealth of Pennsylvania for illegal reasons.

9.     Specifically, the plaintiff sought to peaceably operate as a Restaurant and lounge with music and

dancing, but has been unable to do so because of the organized opposition of the private defendants in

harmony with the acts of the public actors identified as defendants herein.

**PARTIES**

10.    Plaintiff conducts business at 626-628 North Front Street, County of Philadelphia,

Pennsylvania.

11.    The Defendants are:

a.     The City of Philadelphia, is a municipal corporation, Class 1 City, and/or political

subdivision which operates, by and through its elected and/or duly appointed or employed,

officers, employees, representatives, agents and servants, with a place of business at One

Parkway, 1515 Arch Street, City and County of Philadelphia, Pennsylvania.

b.     The City of Philadelphia Police Department is a municipal law enforcement agency,

authorized and established under the laws of the Commonwealth of Pennsylvania and the City of

Philadelphia, and at all times material hereto, the actions of said Police Department and its

constituent districts, including but not limited to the 6th District, were undertaken by its duly

appointed and employed officers, employees, agents, servants and representatives, with a place

of business at 750 Race Street, County of Philadelphia, Pennsylvania.

c.       Defendant, Sergeant Michael Brennan, is on information and belief, an individual duly

appointed and employed by the Philadelphia Police Department, 6th District, who under the

color of the law at all times material hereto acted as an authorized agent of defendant, City of

Philadelphia, Philadelphia Police Department, at its place of business at 750 Race Street, City

and County of Philadelphia, Pennsylvania.

d.       Defendant Captain Brian Korn is, on information and belief, an individual duly

appointed and employed by the Philadelphia Police Department, 6th District, who under the

color of the law acted at all times material hereto as an authorized agent of defendant, City of

Philadelphia, Philadelphia Police Department at its place of business at 750 Race Street, City

and County of Philadelphia, Pennsylvania.

e.       Defendant Northern Liberties Neighborhood Association (hereafter "NLNA") is, on

information and belief, a civic association conducting business at 700 North 2nd Street, City

and County of Philadelphia, Pennsylvania.

f.       Defendant, David Witz, is an individual residing at 511 Montrose Street, City and

County of Philadelphia, Pennsylvania, and on information and belief, was at all times material

hereto, a member of the Northern Liberties Neighborhood Association.

g.       Defendant Matt Ruben, was on information and belief, at all times material hereto, the

President and Zoning Committee Director, and/or authorized agent of the NLNA at its place of

business at 700 North 2nd Street, City and County of Philadelphia, Pennsylvania.

h.       Defendant Larry Freedman, was, at all times material hereto, the Vice President and

Zoning Committee Director, and/or authorized agent of the NLNA at its place of business at

700 North 2nd Street, City and County of Philadelphia, Pennsylvania.

i.       Defendant Judy Donovan, in her capacity as an individual and on information and belief

a member of the NLNA, maintained a last place of residence at 117 Fairmount Ave, City and

County of Philadelphia, Pennsylvania.

j.       Defendant Richard Donovan, in his capacity as an individual and on information and

belief as a member of the NLNA, maintained a last place of residence at 117 Fairmount Ave,

City and County of Philadelphia, Pennsylvania.

k.       Defendant James Brossy, in his capacity as an individual and on information and belief

as a member of the NLNA, maintained a last place of residence at 106 Fairmount Ave., City

and County of Philadelphia, Pennsylvania.

l.       Defendant Debbie Rudman, in her capacity as an individual and on information and

belief as a member of the NLNA, maintained a last place of residence at 106 Fairmount Ave.,

City and County of Philadelphia, Pennsylvania.

m.       Defendant, Christopher Sawyer, in his capacity as an individual and d/b/a

Philadelinquency, an online blog at www.philadelinquency.com, operating at 2434 East

Cumberland Street, City and County of Philadelphia, Pennsylvania.

n.       Defendant, Philebrity.com, its owners, agents, representatives and/or employees, in its

capacity as an entity and by and through the aforesaid individuals, operating at 1021 N.

Hancock St., Apartment #1, City and County of Philadelphia, Pennsylvania.

12.     State and federal claims set forth below derive from a common nucleus of operative facts so
that this court may exercise supplemental jurisdiction over the state-law claims under *28 U.S.C. § 1367*.

## ALLEGATIONS COMMON TO ALL COUNTS

13.     Plaintiff is a Restaurant and bar operating at 628 North Front Street in the Northern Liberties
section of Philadelphia.

14.     The owner of Plaintiff is Marc Stein.

15.     Plaintiff entered into a commercial lease to operate on April 16, 2011.

16.     In March of 2011, Plaintiff commenced its Liquor Control Board application, a process which
took approximately nine months.

17.     The Northern Liberties Neighborhood Association ("NLNA") did not oppose Plaintiff's original
application for a liquor license.

18.     The liquor license was approved on January 20, 2012.

19.     In preparing to open a fully licensed Restaurant and bar, Plaintiff applied for additional licenses
and inspections.

20.     On March 24, 2011, the establishment Plaintiff operates had a use permit, zoning classification
C-2 allowing first and second floor accessory live entertainment with D.J. dancing and stage shows.
See the Use Permit attached hereto as Exhibit A

21.     Prior to opening for business, Plaintiff had obtained the following approvals and licenses:

      a.     Zoning Classification C-2: Use for Restaurant and Bar on first and second floor with
      accessory live entertainment - includes DJ music, dancing and stage show.

      b.     Renovations to Plaintiff approved by the City Department of License and Inspections

for two dance floors and two DJ music booths. Exhibit A

    c.       Plaintiff received zoning approval for live entertainment, DJ music and dancing. Exhibit

A

    d.       Plaintiff received approval for business privilege licensing, food preparation certification,

lawful occupancy certification, fire certification, electrical inspection certification, liquor license

and amusement permit. Exhibit B

22.     In furtherance of its obligations to complete its applications for proper licensure, Plaintiff hired a

contractor to submit engineering plans to the city. These plans were submitted to the City of

Philadelphia on April 8, 2011

23.     On or about May 19, 2011, the City of Philadelphia approved the plans and sealed the

blueprints for Club Shok. Mr. Stein later changed the name of the venue to Aura. The architect

providing these blueprints were HBD Associates Inc. -- Architect of Record is Joseph Catelli Architect,

Inc. The Tenant Use Classification is listed as A-2 & A-3 Restaurant and Lounge Project Description:

"Commercial Tenant Interior Fit-Out for Dining, Entertainment as Use Groups A-2 & A-3". Further,

the "Proposed Floor Plans" clearly show a DJ booth on the first floor and a "DJ Console" on the second

floor. *See*, "Drawing Sheet A-1.4" and "Wall Construction Plans A-1.6, " attached hereto as Exhibit

C

24.     At no point during the approval process were there objections to the proposed renovations or

transfer of licenses.

25.     Plaintiff received the necessary licenses to operate as a restaurant bar with disc jockey and

dancing.

26.     Subsequently, Plaintiff received approval to renovate the property.

27.     Renovations to the premises made by Plaintiff, including but not limited to soundproofing, other renovations, were substantial and cost approximately $624,628.35 plus licensing and permit fees.

28.     On January 28, 2012, Plaintiff opened its doors as a Restaurant & bar with a disc jockey and dancing with expected hours of operation were Monday thru Sunday 10:00 AM to 2:00 AM.  Event included: barmitzvah, batmitzvah, sweet 16, engagement, bachelor, bachelorette, open mic, live performance, wedding receptions, bridal, birthdays, DJ parties - latin, house.  As a result of Plaintiff denial of a Special Assembly License it's hours were restricted to 9:00 PM to 2:00 AM on Fridays and Saturdays.

29.     The music played at Plaintiff is R&B, Hip-Hop and Reggae and the targeted demographic for clientele is "upscale urban."

30.     Plaintiff patrons are predominantly African American and the establishment hosts events sponsored by sororities, fraternities, social groups, entertainment groups and businesses all over the country.

31.     The zoning permitted on the premises when Plaintiff opened included use for a restaurant and bar, live entertainment, disc jockey and dancing.

32.     In furtherance of obtaining its permits, Plaintiff was required to obtain from the City of Philadelphia a Special Assembly and Amusement License.

33.     By March of 2012, Plaintiff had obtained all of the necessary pre-requisite approvals needed to obtain the Special Assembly and Amusement License.  These included a zoning permit, business privilege license, certificate of occupancy, lawful occupancy certificates, criminal history check, tax

clearance and Amusement License.

34.     On April 3, 2012, Plaintiff filed for said licenses.  There were no notices of violation issued prior to this filing nor after the filing.

35.     Even though Plaintiff obtained all of the necessary approvals for the Special Assembly and Amusement License, their application was denied by the City of Philadelphia, Board of Review on May 29, 2012.

36.     It is, on information and belief, averred that the license application was denied in part due to a comprehensive and purposeful campaign of opposition between and among the defendants herein with a specific goal of effecting a denial of the application and preventing Plaintiff from operating pursuant to its planned objectives.

37.     Plaintiff discovered that the Philadelphia Police Department, 6th District opposed the Special Assembly and Amusement License application because the NLNA informed the 6th District that Plaintiff was operating illegally. The fact is that Plaintiff was, at all times material hereto, operating in a legal manner.

38.     Members of the Northern Liberties community and NLNA have tirelessly made efforts to inhibit Plaintiff's business operations.

39.     On information and belief, members of the NLNA were instructed to take action designed to prevent Plaintiff from operating its business and to effectively shut Plaintiff down.

40.     Actions undertaken by and behalf of the NLNA and its constituent members, individually and collectively, against Plaintiff's lawful business operations included but were not limited to:

        a. Photographing the patrons of Plaintiff and their activities;

b. Directing negative comments to Plaintiff's patrons and staff during events;

c. Attacking Plaintiff on social networking and blogging sites, as well as through e-mails; and

d. Filing scores of unfounded complaints with the City of Philadelphia, Police Department.

41.    Northern Liberties is a nightlife destination. Moreover, bars, clubs, Restaurants and lounges surround all of the residential areas, specifically the proximate to the neighbors making complaints on Plaintiff's operations. Although, it is several nightlife locations generate business in that area, neighbors and members of the NLNA try to attribute activity solely to Plaintiff. See a map of the area showing the nightlife destinations attached hereto as Exhibit D

42.    Plaintiff is the only bar, restaurant, or nightclub in Northern Liberties that has been persecuted in this fashion, and not coincidentally, is the only such establishment that caters to the "upscale urban" demographic.

43.    Despite the absence of any nuisance violations or criminal infractions, Plaintiff's Special Assembly and Amusement License was revoked on or about June 27, 2012. See attached letter and notice of denial as Exhibit E

44.    To date, and on information and belief, the Philadelphia Nuisance Task Force has no registered complaints involving Plaintiff.

45.    Without the Special Assembly and Amusement License permit Plaintiff cannot have a disc jockey, and attending patrons are not even allowed to dance.

46.    Due to the concerted and purposeful efforts of the defendants, Plaintiff has struggled to stay

open for business.

47.     Plaintiff has been unable to operate in the manner in which it was originally conceived, and

which was originally approved by the City of Philadelphia.

48.     Accordingly, Plaintiff has sustained a substantial loss of business, manifested by, among other

things, the cancellation of events due to Plaintiff's inability to provide a disc jockey and dancing, and

also due to the adverse effect of false and malicious claims made on the Internet and other open forums.

49.     Denial of Plaintiff's Special Assembly and Amusement License application was arbitrary and

capricious and denied Plaintiff their fundamental and constitutionally protected rights under the

Constitutions of the United States and the Commonwealth of Pennsylvania. Said rights, include a

violation of due process with notice and opportunity to be heard, and equal protection under the law.

## FIRST CLAIM FOR RELIEF

Art. XIV, U.S. Constitution, Deprivation of Civil Rights 42 U.S.C. § 1983
Plaintiff v. City of Philadelphia

50.     Plaintiff incorporates by reference and realleges paragraphs 1 to 49 of this complaint.

51.     Plaintiff contends under *42 U.S.C.S. § 1983*, the City, acting under color of state law, deprived

them of a property interest (special assembly license) without according them due process of law.

52.     The City of Philadelphia is a Class 1 City authorized under the laws of the United States and the

Commonwealth of Pennsylvania to administer and govern all necessary agencies and departments for

the City and County of Philadelphia.

53.     In its capacity under the applicable laws, the City of Philadelphia, by and through its Zoning

Board of Adjustment, and related agencies, departments, divisions, directors, officers, employees and

representatives, has the power to issue business licenses, including but not limited to Use and

Occupancy and Special Assembly Licenses, Liquor License, Amusement Permit, fire certification, electrical inspection, food preparation and business privilege.

54.    The City of Philadelphia, by and through its duly appointed agencies, approved Plaintiff's initial licenses and application to renovate and operate their establishment as a restaurant and lounge with accessory live entertainment such as disc jockey, dancing and stage shows.

55.    On March 24, 2011, a Use Permit was issued for the following: Office on third floor of 626-628 N. Front Street in the same building with an existing Restaurant and bar on first and second floor with accessory live entertainment (not as defined as in *14-1605*) with DJ dancing and stage shows on first and second floor" See attached Permit attached hereto as Exhibit A

56.    Sealed engineer plans were submitted to the City of Philadelphia clearly outlining space for two disc jockey booths and two dance floors.

57.    On or about May 19, 2011, the sealed engineer plans were approved by the City of Philadelphia, Department of Licenses and Inspections, by and through its duly appointed agents, employees and/or representatives.

58.    Renovations and improvements were performed over the next nine months and, on information and belief, without any known protest or opposition from any party herein.

59.    Renovations and improvements were made at an approximate cost to Plaintiff of $624,628.35 plus licensing and permit fees.  Exhibit F.

60.    With all requisite licenses, certifications and inspections obtained, and with renovations having been made, Plaintiff opened for business on January 28, 2012.

61.    During the application process Plaintiff submitted an application fee for $100.00 that was

processed and cleared.  Further, Plaintiff had to provide a $5,000.00 bond to the City of Philadelphia.

Plaintiff was never notified that permits were to be denied.  Exhibit G.  The $5,000.00 bond was never

returned.

62.     Plaintiff contends under *42 U.S.C.S. § 1983*, the City of Philadelphia, acting under color of

state law, deprived Plaintiff of a property interest (Special Assembly License) without according them

due process of law.

63.     On or around June 27, 2012, the Philadelphia L&I Review Board voted to deny Plaintiff's

appeal for a Special Assembly license.  See Notice of Decision attached hereto as Exhibit E

64.     Pursuant *Philadelphia Code § 9-703*, Plaintiff has complied with all the statutory requirements

necessary to obtain annual renewal of a Special Assembly License.

SECOND CLAIM FOR RELIEF

Art. XIV, U.S. Constitution, Equal Protection on the Basis of<br>Selective Enforcement 42 U.S.C. § 1983<br>Plaintiff v. Sergeant Michael Brennan

65.     Plaintiff incorporates by reference and realleges paragraphs 1 to 64 of this complaint.

66.     Plaintiff alleges that Defendant, while acting under Pennsylvania law, deprived them of equal

protection under the law and due process. See *U.S. Const. amend. XIV*.  Plaintiff seeks to vindicate

his rights under the Equal Protection Clause because Defendant "selectively enforced" state and local

laws against the club.

67.     Sergeant Michael Brennan was at all times material hereto a duly appointed officer of the City of

Philadelphia Police Department (hereafter "PPD"), and on information and belief was assigned to the

6th Police District.

68.     On numerous occasions after the opening of the Restaurant & Lounge, Sgt. Brennan acting in his official capacity as an officer of the PPD would conduct or cause to be conducted unfounded and unnecessary inspections during business operations with the intent and result of intimidating, harassing and threatening patrons.

69.     Patrons and staff were interrogated and intimidated on the premises and without probable cause for doing so.

70.     Defendant and the PPD continued a purposeful practice of intimidation and harassment which included, but was not limited to, stopping at Plaintiff at least eight times per weekend. Officers were directed to surround the premises with police vehicles, walk through the club and interrogate patrons and staff. These acts of intimidation were performed regularly, purposefully, maliciously, selectively, and without proper cause for doing so.

71.     Said acts of the PPD served no legitimate or reasonable law enforcement purpose and somewhat counterintuitively disrupted the surrounding neighborhood and neighbors.

72.     Even over time as the Defendant and the PPD realized that the derivative complaints were unfounded and false, Plaintiff continues to suffer from an unwarranted police presence to the detriment of its lawful business activities.

73.     The aforesaid actions of Sgt. Brennan were: (i) objectively unreasonable, (ii) disproportionate when compared to other similarly licensed establishments in the same community, (iii) calculated to harass and intimidate the club's patrons, (iv) motivated by racial animus, and (v) with the object of driving away its patrons.

THIRD CLAIM FOR RELIEF

Art. XIV, U.S. Constitution, Equal Protection on the Basis of
Selective Enforcement 42 U.S.C. § 1983
Plaintiff v. Captain Brian Korn

74.     Plaintiff incorporates by reference and realleges paragraphs 1 to 73 of this complaint.

75.     The plaintiff repeats the allegations set forth in paragraphs one through seventy-two of this

Complaint and incorporates them by reference herein as if pleaded at length.

76.     Plaintiff alleges that Defendant, while acting under Pennsylvania law, deprived them of equal

protection under the law and due process. See *U.S. Const. amend. XIV*.  Plaintiff seeks to vindicate

his  rights under the Equal Protection Clause because Defendant "selectively enforced" state and local

laws against the club.

77.     Captain Brian Korn was at all times material hereto a duly appointed officer of the City of

Philadelphia Police Department (hereafter "PPD"), and on information and belief was assigned to the

6th Police District.

78.     On numerous occasions after the opening of Plaintiff, Captain Korn acting in his official capacity

as an officer of the PPD would conduct or cause to be conducted unfounded and unnecessary

surveillance during business operations with the intent and result of intimidating, harassing and

threatening patrons.

79.     Patrons and staff were interrogated and intimidated on the premises and without probable cause

for doing so.

80.     Defendant and the PPD continued a purposeful practice of intimidation and harassment which

included, but was not limited to, stopping at Plaintiff at least eight times per weekend. Officers were

directed to surround the premises with police vehicles, walk through the club and interrogate patrons

and staff. These acts of intimidation were performed regularly, purposefully, maliciously, selectively, and without proper cause for doing so.

81.     Said acts of the PPD served no legitimate or reasonable law enforcement purpose and somewhat counterintuitively disrupted the surrounding neighborhood and neighbors.

82.     Even over time as the Defendant and the PPD realized that the derivative complaints were unfounded and false, Plaintiff continues to suffer from an unwarranted police presence to the detriment of its lawful business activities.

83.     The aforesaid actions of Captain Korn were:  (i) objectively unreasonable, (ii) disproportionate when compared to other similarly licensed establishments in the same community,  (iii) calculated to harass and intimidate the club's patrons, (iv) motivated by racial animus, and (v) with the object of driving away its patrons.

FOURTH CLAIM FOR RELIEF

State Common Law Claim for Defamation
Plaintiff v. David Witz

84.     Plaintiff incorporates by reference and realleges paragraphs 1 to 83 of this complaint.

85.     A defamation action is based on an individual's right to enjoy a reputation unimpaired by false and defamatory attacks. *Spain v. Vicente, 315 Pa. Super. 135 (1983).* Further it consists of the utterance or publication of defamatory words or written material which tends to blacken a person's reputation and lower him in the estimation of the community; to expose a person to public hatred,

contempt, or ridicule; to injure a person in his or her business, profession or office; or to deter third

persons from associating or dealing with him. *Sobel v. Wingard, 366 Pa. Super. 482 (1987);*

*Marcone v. Penthouse Int'l Magazine for Men, 754 F.2d 1072 (3d Cir. 1985), cert. denied, 474*

*U.S. 864, 106 S. Ct. 182 (1985).*

86.     At all times mentioned herein, plaintiff was a law abiding citizen of the Commonwealth of

Pennsylvania, who enjoyed the respect, confidence and esteem of his neighbors, as well as of all others

in the community, and has never been guilty of any crime, offense or violation of the law which would

tend to lessen the respect, confidence and esteem which he has enjoyed, and to which he was entitled.

87.     On the following dates, the defendant, intending to injure the plaintiff and to deprive him of his

good name, fame, credit and reputation, falsely, maliciously, wickedly and illegally communicated

statements concerning plaintiff over the internet, which contained the following scandalous, defamatory

and libelous statements:

     a.     April 6, 2012 - David Witz, Twitter - "I'll be on Fox 29 at 10pm...bitching about our

block's nuisance dance club." Exhibit H

     b.     David Witz moved out of Northern Liberties next door to Plaintiff on May 15, 2012.

Yet he continued to harass Plaintiff through social media.  Exhibit I

     c.     May 23, 2012 - David Witz, Twitter - "Club Aura: Grand opening, grand closing?

Exhibit J

     d.     June 21, 2012 - David Witz, Twitter - "Here's why Club Aura was shut down..." Link

to philebrity "Fare thee well Club Plaintiff you totally sucked"  Exhibit K

     e.     June 21, 2012 - David Witz, Twitter - "Farewell, Club Aura. You will not be missed."

Exhibit L

f.      June 27, 2012 - David Witz, Twitter - "Nuisance bar Club Aura appealed their

cease-operations notice. The hearing was yesterday. They lost. The neighbors rejoice." Exhibit

M

g.      June 27, 2012- Email from David- Speaks about how Plaintiff lost the appeal for the

cease-operations order. He then urges neighbors to keep eyes and ears on the club and "report

any legit violation--noise or music escaping the club, raucous customers disrupting the street at

let-out, public urination, fistfights, any of those things that made Club Aura such an unwelcome

and illegal invasion of a peaceful Northern Liberties community." Exhibit N

h.      June 29, 2012- Email from David mentioning the outcome of the Hearing that previous

Tuesday. Also mentioned that they have asked the neighbors on Fairmount to keep a close eye

and ear on the club, and the 6th District Police was asked to put the club on their roll call notice.

Exhibit O

i.      August 9, 2012 - David Witz, Twitter - "Farewell, Club Aura. For good this time."

Exhibit P

j.      On October 4, 2012 - David wrote a post on NorthernLiberties.org titled: Club Aura

loses another club stating:

      "ClubAura's sister nightmare in Old City, Dreemz aka Rain, has finally been

      shut down by the city.  Reason: no special assembly license (and a LOT of neighbor

      complaints.)

      The special assembly license is needed for live music, DJs dance floors and

such. The owners of Dreemz aka Rain is Marc Stein, who owns Club Aura, and he

never bothered to get a special assembly license for that club, either. That's why Aura

is partially shut down now. I can only hope his getting caught and shut down in Old

City means the Northern Liberties neighbors of Aura may finally get some relief from

this toxic, unlicensed dance club." Exhibit Q

88.     The statements contained in these communications were intended to and did convey to the

readers thereof, either directly or by implication, that Plaintiff operates unlawfully and that its patrons are

undesirable. Moreover, club Dreemz closed because Plaintiff sold it.

89.     The statements and charges in the article are false so far as they reflect upon plaintiff's character

and reputation.

90.     The plaintiff has never, committed any violations alleged by defendant, nor was he or the club

ever an accessory to, nor an aider and abettor of, such unlawful acts, nor has he ever been guilty of any

other violation of law, but he has at all times been a peaceable and law abiding business operator and

inhabitant of the several communities in which he has resided from the day of his birth to the present

time.

91.     Defendant knew or should have known that the statements contained in therein and identified in

paragraph 87 were false when made, and defendant communicated them either intentionally and

maliciously, or with reckless disregard for their truth or falsity, or negligently and carelessly.

92.     The statements were posted, communicated on the dates articulated above, via internet over the

world wide web and read by the plaintiff's neighbors, friends and diverse other persons.

93.     By reason of the statements and charges contained in these communications and identified in

paragraph 87, the plaintiff has been brought into scandal and reproach, and has been held up to odium, scorn and contempt among his neighbors, business acquaintances, and other good citizens, and is suspected by them to have been guilty of the crimes and fraudulent practices which defendant's article imputed to plaintiff, as a result of which the plaintiff has suffered in his business, his reputation, feelings and peace of mind, to his great financial loss and damage.

FIFTH CLAIM FOR RELIEF

Art. XIV, U.S. Constitution, Discrimination by Interfering with a
Contractual interest 42 U.S.C. § 1981
Plaintiff v. David Witz

94.     Plaintiff incorporates by reference and realleges paragraphs 1 to 93 of this complaint.

95.     Federal statute, *42 U.S.C. § 1981*, outlaws racial discrimination in the making and enforcing of private contracts. The statute provides that "[a]ll persons… shall have the same right…to make and enforce contracts…as is enjoyed by white citizens." *42 U.S.C. § 1981 (West 2007)*. To prove a *§ 1981* claim, a plaintiff must show that the defendant intended to discriminate on the basis of race, and that the discrimination interfered with a contractual interest. *See, e.g., Denny v. Elizabeth Arden Salons, Inc., 456 F.3d 427, 434 (4th Cir. 2006) (citing cases).*

96.     Plaintiff target demographic is "upscale urban". Although the Plaintiff is not a minority his club is patronized by a crowd comprised of minorities, mainly persons of African American or Hispanic heritage.

97.     David Witz (hereinafter "Witz") resided next door to 628 North Front Street at the time Plaintiff rented this building; Witz and Plaintiff had the same landlord and was an active member of the NLNA. He spends a substantial amount of time and exerts disproportionate energy in pursuit of removing

Plaintiff from the Northern Liberties neighborhood.

98.    While Witz still resided next door to Plaintiff, he ordered the owners of Aura to close their

business and refused to meet to inspect the additional soundproofing work.  He rejected an offer to tour

the building with Plaintiff's sound technician, vowing instead to close Plaintiff's doors.

99.    Witz repeatedly accused the owners of forcing him to leave and has recruited support from the

other residents on the block.  This incident has incited hostility towards Plaintiff and its patrons.  At no

time did the owners of Aura request that Witz lease be revoked or that he be asked to vacate the

residence.

100.    Witz moved out of the residence adjacent to Plaintiff but continued to harass them by including

but not limited to: sitting outside the club in his vehicle and taking pictures of Plaintiff and its patrons,

spreading falsities on the internet, conspiring with NLNA members/neighbors, police and other

community figures in an attempt to close Plaintiff's doors permanently.

101.    Defendant calls in complaints to the Police and circulates false information about Plaintiff on the

internet.

102.    Police are constantly called to the property during business hours.  Defendant and members of

the NLNA are filing false reports to the police about Plaintiff and its customers.  Moreover, when

officers investigate these calls none of the reports are founded.

103.    Plaintiff's attempts to communicate and associate with defendant, the NLNA

neighbors/members and officers have fallen on deaf ears.

104.    As a direct result of the concerted effort of defendant and the NLNA neighbors/members and

officers, Plaintiff was and still is unable to operate as it intended to.

SIXTH CLAIM FOR RELIEF

Art. XIV, U.S. Constitution, Discrimination by Interfering with a
Contractual interest 42 U.S.C. § 1981
Plaintiff v. Northern Liberties Neighborhood Association

105.     Plaintiff incorporates by reference and realleges paragraphs 1 to 104 of this complaint.

106.     Federal statute, *42 U.S.C. § 1981*, outlaws racial discrimination in the making and enforcing of

private contracts. The statute provides that "[a]ll persons… shall have the same right…to make and

enforce contracts…as is enjoyed by white citizens." *42 U.S.C. § 1981 (West 2007)*. To prove a *§*

*1981* claim, a plaintiff must show that the defendant intended to discriminate on the basis of race, and

that the discrimination interfered with a contractual interest. *See, e.g., Denny v. Elizabeth Arden*

*Salons, Inc., 456 F.3d 427, 434 (4th Cir. 2006) (citing cases)*.

107.     Plaintiff target demographic is "upscale urban". Although the Plaintiff is not a minority his club is

patronized by a crowd comprised of minorities, mainly persons of African American or Hispanic

heritage.

108.     Matt Ruben and Larry Freedman, officers of Northern Liberties Neighborhood Association,

met with Plaintiff in the beginning to discuss Plaintiff's operating policies.  Once this target demographic

was discovered, Matt Ruben representing the NLNA at a Special Assembly License Hearing in August

spoke against Plaintiff.

109.     The NLNA through its agents have singled out Plaintiff and made it a goal to shut down their

operations solely because of the patrons Plaintiff has coming out to its events.

110.     Police are constantly called to the property during business hours.  Members of the NLNA are

filing false reports to the police about Plaintiff and its customers.  Moreover, when officers investigate

these calls none of the reports are founded.

111.    As a direct result of the concerted effort of NLNA members and officers, Plaintiff was and still is unable to operate as it intended to.

SEVENTH CLAIM FOR RELIEF

Art. XIV, U.S. Constitution, Discrimination by Interfering with a<br>Contractual interest 42 U.S.C. § 1981<br>Plaintiff v. Matt Ruben

112.    Plaintiff incorporates by reference and realleges paragraphs 1 to 111 of this complaint.

113.    Federal statute, *42 U.S.C. § 1981*, outlaws racial discrimination in the making and enforcing of private contracts. The statute provides that "[a]ll persons… shall have the same right…to make and enforce contracts…as is enjoyed by white citizens." *42 U.S.C. § 1981 (West 2007)*. To prove a *§ 1981* claim, a plaintiff must show that the defendant intended to discriminate on the basis of race, and that the discrimination interfered with a contractual interest. *See, e.g., Denny v. Elizabeth Arden Salons, Inc., 456 F.3d 427, 434 (4th Cir. 2006) (citing cases)*.

114.    Plaintiff target demographic is "upscale urban". Although the Plaintiff is not a minority his club is patronized by a crowd comprised of minorities, mainly persons of African American or Hispanic heritage.

115.    Matt Ruben and Larry Freedman, officers of Northern Liberties Neighborhood Association, met with Plaintiff in the beginning to discuss Plaintiff's operating policies. Once this target demographic was discovered, Matt Ruben representing the NLNA at a Special Assembly License Hearing in August spoke against Plaintiff.

116.    Matt Ruben, is the President of the Board of the Directors of the Northern Liberties Neighborhood Association. He spends a substantial amount of time and exerts disproportionate energy

in pursuit of removing Plaintiff from the Northern Liberties neighborhood.

117.    On or around July 6, 2012, Ruben explained Plaintiff's permit situation in detail in a post on the website northernliberties.org.  The post informed people of what is and isn't allowed on the premises, what violations to look for inside and outside the premises, and urged those watching to continuing making reports.  Exhibit R

118.    On or around July 3, 2012, a meeting held at the NLNA's community building at Fairmount Avenue and 3rd Street was packed to capacity to address the fatal shootings of two people at a Restaurant located inside the Piazza, an apartment complex in Northern Liberties.  With a captive audience, Ruben first addressed the unfounded claim that Plaintiff is operating illegally (without licensing and permits) by having a DJ at an upcoming event, yet nothing in promotional materials supported this claim.  Exhibit S

119.    On or around July 6, Ruben sent an email to Shawn Ward and posted on NorthernLiberties.org explaining what Plaintiff is and is not allowed to do under legal bar/Restaurant use.   Further he stated, "they can have a single-release party, and have a special guest, and they can make it free and public, or a private party with tickets. And they can play the music, as long as its not from a live band or from a DJ....So Folks should keep their eyes and ears open, and report any problems, just as they were doing before." Exhibit P

120.    On July 9, 2012, Ruben alerted the 6th Police District, Sargent LaTorre of Pennsylvania Liquor Enforcement, Councilman Mark Squilla, State Representative Michael O'Brien, Ann Pasquariello at the Philadelphia City Solicitor's office and Plaintiff zoning attorney Shawn Ward that there was a post from an unknown user that Plaintiff would have a DJ working at the club that evening.  Exhibit T.  The post

did not in fact come from Plaintiff itself. Further, there was no DJ present at any time during Plaintiff's operations.

121.    A response was sent from Councilman Squilla (???) the same day to Matt Ruben - stating, "Matt, good job in contacting all parties. Let's see if Aura is really going to try and use a DJ. If this is documented by the police then a cease of all operations can be issued. Please call Police if anyone sees DJ or any other live music." Exhibit U

122.    On July 30, 2012, after combing thru social media, Ruben found pictures online depicting the interior of Plaintiff's venue. Ruben then attached them to an e-mail which was forwarded to several people including the City Solicitor as well as Pennsylvania Liquor Enforcement. Ruben attempted to assert violations of the Philadelphia Code based on these pictures, but again the alleged violations proved to be unfounded. Exhibit V

123.    Ruben makes it a priority to be informed on Plaintiff's permit situation. Moreover, he makes Plaintiff's permit situation known to anyone that will listen. Yet on August 13, 2012, he was unable to articulate with certainty the nature of the permits held by the Arrow Swim Club, another Northern Liberties bar/club venue. Ruben has therefore selectively targeted Plaintiff. Exhibit W

124.    Police are constantly called to the property during business hours. Members of the NLNA are filing false reports to the police about Plaintiff and its customers. Moreover, when officers investigate these calls none of the reports are founded.

125.    Plaintiff's attempts to communicate and associate with the NLNA neighbors/members and officers have fallen on deaf ears.

126.    As a direct result of the concerted effort of NLNA neighbors/members and officers, Plaintiff

was and still is unable to operate pursuant to its initial intent and the City of Philadelphia's initial authorization.

## EIGHTH CLAIM FOR RELIEF

State Common Law Claim for Defamation
Plaintiff v. Matt Ruben

127.    Plaintiff incorporates by reference and realleges paragraphs 1 to 126 of this complaint.

128.    A defamation action is based on an individual's right to enjoy a reputation unimpaired by false and defamatory attacks. *Spain v. Vicente, 315 Pa. Super. 135 (1983).* Further it consists of the utterance or publication of defamatory words or written material which tends to blacken a person's reputation and lower him in the estimation of the community; to expose a person to public hatred, contempt, or ridicule; to injure a person in his or her business, profession or office; or to deter third persons from associating or dealing with him. *Sobel v. Wingard, 366 Pa. Super. 482 (1987); Marcone v. Penthouse Int'l Magazine for Men, 754 F.2d 1072 (3d Cir. 1985), cert. denied, 474 U.S. 864, 106 S. Ct. 182 (1985).*

129.    At all times mentioned herein, plaintiff was a law abiding citizen of the Commonwealth of Pennsylvania, who enjoyed the respect, confidence and esteem of his neighbors, as well as of all others in the community, and has never been guilty of any crime, offense or violation of the law which would tend to lessen the respect, confidence and esteem which he has enjoyed, and to which he was entitled.

130.    On the following dates, the defendant, intending to injure the plaintiff and to deprive him of his good name, fame, credit and reputation, falsely, maliciously, wickedly and illegally communicated statements concerning plaintiff over the internet, which contained the following scandalous, defamatory and libelous statements:

a.    On or around July 3, 2012, a meeting held at the NLNA's community building at

Fairmount Avenue and 3rd Street was packed to capacity to address the fatal shootings of two

people at a Restaurant located inside the Piazza, an apartment complex in Northern Liberties.

With a captive audience, Ruben first addressed the unfounded claim that Plaintiff is operating

illegally (without licensing and permits) by having a DJ at an upcoming event, yet nothing in

promotional materials supported this claim.  Exhibit S

b.    On July 30, 2012, after combing thru social media, Ruben found pictures online

depicting the interior of Plaintiff's venue.  He then attached them to an e-mail which was

forwarded to several people including the City Solicitor as well as Pennsylvania Liquor

Enforcement.  Ruben attempted to assert violations of the Philadelphia Code based on these

pictures but again his violations were unfounded.  Exhibit V

131.    The statements contained in these communications were intended to and did convey to the

readers thereof, either directly or by implication, that Plaintiff operates unlawfully and that its patrons are

undesirable.

132.    The statements and charges in the article are false so far as they reflect upon plaintiff's character

and reputation.

133.    The plaintiff has never, committed any violations alleged by defendant, nor was he or the club

ever an accessory to, nor an aider and abettor of, such unlawful acts, nor has he ever been guilty of any

other violation of law, but he has at all times been a peaceable and law abiding business operator and

inhabitant of the several communities in which he has resided from the day of his birth to the present

time.

134.    Defendant knew or should have known that the statements contained in therein and identified in paragraph 130 were false when made, and defendant communicated them either intentionally and maliciously, or with reckless disregard for their truth or falsity, or negligently and carelessly.

135.    The statements were posted, communicated on the dates articulated above, via internet over the worldwide web and read by the plaintiff's neighbors, friends and diverse other persons.

136.    By reason of the statements and charges contained in these communications and identified in paragraph 130 , the plaintiff has been brought into scandal and reproach, and has been held up to odium, scorn and contempt among his neighbors, business acquaintances, and other good citizens, and is suspected by them to have been guilty of the crimes and fraudulent practices which defendant's article imputed to plaintiff, as a result of which the plaintiff has suffered in his business, his reputation, feelings and peace of mind, to his great financial loss and damage.

NINTH CLAIM FOR RELIEF

Art. XIV, U.S. Constitution, Discrimination by Interfering with a
Contractual interest 42 U.S.C. § 1981
Plaintiff v. Larry Freedman

137.    Plaintiff incorporates by reference and realleges paragraphs 1 to 136 of this complaint.

138.    Federal statute, *42 U.S.C. § 1981*, outlaws racial discrimination in the making and enforcing of private contracts. The statute provides that "[a]ll persons… shall have the same right…to make and enforce contracts…as is enjoyed by white citizens." *42 U.S.C. § 1981 (West 2007)*. To prove a *§ 1981* claim, a plaintiff must show that the defendant intended to discriminate on the basis of race, and that the discrimination interfered with a contractual interest. *See, e.g., Denny v. Elizabeth Arden Salons, Inc., 456 F.3d 427, 434 (4th Cir. 2006) (citing cases).*

139.    Plaintiff target demographic is "upscale urban". Although the Plaintiff is not a minority his club is patronized by a crowd comprised of minorities, mainly African American and Hispanic.

140.    Matt Ruben and Larry Freedman, officers of Northern Liberties Neighborhood Association, met with Plaintiff in the beginning to discuss Plaintiff's operating policies. Once this target demographic was discovered, Matt Ruben representing the NLNA at a Special Assembly License Hearing in August spoke against Plaintiff.

141.    Larry Freedman, is the Zoning Committee Chair of the Northern Liberties Neighborhood Association. He spends a substantial amount of time and exerts disproportionate energy in pursuit of removing Plaintiff from the Northern Liberties neighborhood.

142.    Police are constantly called to the property during business hours. Members of the NLNA are filing false reports to the police about Plaintiff and its customers. Moreover, when officers investigate these calls none of the reports are founded.

143.    Plaintiff's attempts to communicate and associate with the NLNA neighbors/members and officers have fallen on deaf ears.

144.    As a direct result of the concerted effort of NLNA neighbors/members and officers, Plaintiff was and still is unable to operate pursuant to its initial intent and the City of Philadelphia's initial authorization.

TENTH CLAIM FOR RELIEF

State Common Law Claim for Defamation

Plaintiff v. Larry Freedman

145.    Plaintiff incorporates by reference and realleges paragraphs 1 to 144 of this complaint.

146.    A defamation action is based on an individual's right to enjoy a reputation unimpaired by false and defamatory attacks. *Spain v. Vicente, 315 Pa. Super. 135 (1983).* Further it consists of the utterance or publication of defamatory words or written material which tends to blacken a person's reputation and lower him in the estimation of the community; to expose a person to public hatred, contempt, or ridicule; to injure a person in his or her business, profession or office; or to deter third persons from associating or dealing with him. *Sobel v. Wingard, 366 Pa. Super. 482 (1987); Marcone v. Penthouse Int'l Magazine for Men, 754 F.2d 1072 (3d Cir. 1985), cert. denied, 474 U.S. 864, 106 S. Ct. 182 (1985).*

147.    At all times mentioned herein, plaintiff was a law abiding citizen of the Commonwealth of Pennsylvania, who enjoyed the respect, confidence and esteem of his neighbors, as well as of all others in the community, and has never been guilty of any crime, offense or violation of the law which would tend to lessen the respect, confidence and esteem which he has enjoyed, and to which he was entitled.

148.    On the following dates, the defendant, intending to injure the plaintiff and to deprive him of his good name, fame, credit and reputation, falsely, maliciously, wickedly and illegally communicated statements concerning plaintiff over the internet, which contained the following scandalous, defamatory and libelous statements:

   a.    In a Philebrity.com article dated June 21, 2012 Defendant stated,

        *"I have not seen such a blatant disregard for neighbors and authority by an operator in a long time. I am appalled by their inhuman and uncivilized behavior. They*

*have not intention of fixing the problems of excessive noise, rowdy behavior, etc. all in*

*violation of the LCB regulations.  In addition, they are not operating with the required*

*Special Assembly License.*

    *I am requesting that they [Plaintiff] be shut down immediately until these*

*infractions are remedied."* Exhibit X

149.    Plaintiff has not been charged with any violations by the LCB, further contrary to social media they have not acted unlawfully period.

150.    The statements contained in these communications were intended to and did convey to the readers thereof, either directly or by implication, that Plaintiff operates unlawfully and that its patrons are undesirable.

151.    The statements and charges in the article are false so far as they reflect upon plaintiff's character and reputation.

152.    The plaintiff has never, committed any violations alleged by defendant, nor was he or the club ever an accessory to, nor an aider and abettor of, such unlawful acts, nor has he ever been guilty of any other violation of law, but he has at all times been a peaceable and law abiding business operator and inhabitant of the several communities in which he has resided from the day of his birth to the present time.

153.    Defendant knew or should have known that the statements contained in therein and identified in paragraph 148 were false when made, and defendant communicated them either intentionally and maliciously, or with reckless disregard for their truth or falsity, or negligently and carelessly.

154.    The statements were posted, communicated on the dates articulated above, via internet over the

world wide web and read by the plaintiff's neighbors, friends and diverse other persons.

155.     By reason of the statements and charges contained in these communications and identified in

paragraph 148, the plaintiff has been brought into scandal and reproach, and has been held up to odium,

scorn and contempt among his neighbors, business acquaintances, and other good citizens, and is

suspected by them to have been guilty of the crimes and fraudulent practices which defendant's article

imputed to plaintiff, as a result of which the plaintiff has suffered in his business, his reputation, feelings

and peace of mind, to his great financial loss and damage.

## ELEVENTH CLAIM FOR RELIEF

State Common Law Claim for Defamation
Plaintiff v. Judy Donovan

156.     Plaintiff incorporates by reference and realleges paragraphs 1 to 155 of this complaint.

157.     A defamation action is based on an individual's right to enjoy a reputation unimpaired by false

and defamatory attacks. *Spain v. Vicente, 315 Pa. Super. 135 (1983).*  Further it consists of the

utterance or publication of defamatory words or written material which tends to blacken a person's

reputation and lower him in the estimation of the community; to expose a person to public hatred,

contempt, or ridicule; to injure a person in his or her business, profession or office; or to deter third

persons from associating or dealing with him.  *Sobel v. Wingard, 366 Pa. Super. 482 (1987);*

*Marcone v. Penthouse Int'l Magazine for Men, 754 F.2d 1072 (3d Cir. 1985), cert. denied, 474*

*U.S. 864, 106 S. Ct. 182 (1985).*

158.     At all times mentioned herein, plaintiff was a law abiding citizen of the Commonwealth of

Pennsylvania, who enjoyed the respect, confidence and esteem of his neighbors, as well as of all others

in the community, and has never been guilty of any crime, offense or violation of the law which would tend to lessen the respect, confidence and esteem which he has enjoyed, and to which he was entitled.

159.    On the following dates, the defendant, intending to injure the plaintiff and to deprive him of his good name, fame, credit and reputation, falsely, maliciously, wickedly and illegally communicated statements concerning plaintiff over the internet, which contained the following scandalous, defamatory and libelous statements: -

a.      On or around April 2, 2012, Defendant and her husband sent an e-mail to Plaintiff landlord, Yishai Kedar waging complaints regarding prior three weeks on her "otherwise quiet block."

    i.      In the first week of Plaintiff's operation Donovan reported "Loud noise by drunken customers shouting and screaming and playing music." This was reported by her son to the police;

    ii.     The following week her husband alleging encountered someone urinating next to her car;

    iii.    The e-mail went on to state that during "the past weekend (her) husband photographed female customer urinating between cars;"

    iv.     She further stated without any factual support, "Judging from constant turnover of parked cars during club hours it appears that the clientele of Plaintiff are also engaged in...(the) sale of drugs."

    v.      Any doubt about Ms. Donovan's mindset was erased by her statement that she has had the "satisfying experience" since 1981 "of evicting several nuisance

bars." She was particularly enraged by the "...(s)omewhat illegal and sinister operation like Aura." Exhibit Y

    b.      On or around August 10, 2012, Defendant made posted the following on Philebrity.com an online magazine:

> "Rot in hell, club Aura!!  Your kind of operation might have succeeded in the wild and wooly NL [Northern Liberties] about 20 years ago. Why don't you open up at 10th and Butler or in one of the neighborhoods that your 'high class' clientele come from?  (BTW [by the way] the sleazy owner of the place, Mark Stein, testified in court that his place was a 'high class Restaurant' that required people 'to wear shoes.' They apparently don't have bathrooms either since their classy clientele uses Fairmount avenue as their bathroom,. I have a picture of a woman squatting between cars in front of my house.  I and my neighbors are keeping our fingers crossed that these sleazoids don't find a way to rise again." Exhibit Z

160.    The statements contained in these communications were intended to and did convey to the readers thereof, either directly or by implication, that Plaintiff operates unlawfully and that its patrons are undesirable.

161.    The statements and charges in the article are false so far as they reflect upon plaintiff's character and reputation.

162.    The reference to "10th and Butler" is most definitely a reference to the primarily minority demographic of that neighborhood of the City of Philadelphia.

163.    The plaintiff has never, committed any violations alleged by defendant, nor was he or the club

ever an accessory to, nor an aider and abettor of, such unlawful acts, nor has he ever been guilty of any other violation of law, but he has at all times been a peaceable and law abiding business operator and inhabitant of the several communities in which he has resided from the day of his birth to the present time.

164.    Defendant knew or should have known that the statements contained in therein and identified in paragraph 159 were false when made, and defendant communicated them either intentionally and maliciously, or with reckless disregard for their truth or falsity, or negligently and carelessly.

165.    The statements were posted, communicated on the dates articulated above, via internet over the world wide web and read by the plaintiff's neighbors, friends and diverse other persons.

166.    By reason of the statements and charges contained in these communications and identified in paragraph 159, the plaintiff has been brought into scandal and reproach, and has been held up to odium, scorn and contempt among his neighbors, business acquaintances, and other good citizens, and is suspected by them to have been guilty of the crimes and fraudulent practices which defendant's article imputed to plaintiff, as a result of which the plaintiff has suffered in his business, his reputation, feelings and peace of mind, to his great financial loss and damage.

TWELVTH CLAIM FOR RELIEF

State Common Law Claim for Defamation
Plaintiff v. Richard Donovan

167.    Plaintiff incorporates by reference and realleges paragraphs 1 to 166 of this complaint.

168.    A defamation action is based on an individual's right to enjoy a reputation unimpaired by false and defamatory attacks. *Spain v. Vicente, 315 Pa. Super. 135 (1983).* Further it consists of the utterance or publication of defamatory words or written material which tends to blacken a person's

reputation and lower him in the estimation of the community; to expose a person to public hatred, contempt, or ridicule; to injure a person in his or her business, profession or office; or to deter third persons from associating or dealing with him. *Sobel v. Wingard, 366 Pa. Super. 482 (1987); Marcone v. Penthouse Int'l Magazine for Men, 754 F.2d 1072 (3d Cir. 1985), cert. denied, 474 U.S. 864, 106 S. Ct. 182 (1985).*

169.    At all times mentioned herein, plaintiff was a law abiding citizen of the Commonwealth of Pennsylvania, who enjoyed the respect, confidence and esteem of his neighbors, as well as of all others in the community, and has never been guilty of any crime, offense or violation of the law which would tend to lessen the respect, confidence and esteem which he has enjoyed, and to which he was entitled.

170.    On the following dates, the defendant, intending to injure the plaintiff and to deprive him of his good name, fame, credit and reputation, falsely, maliciously, wickedly and illegally communicated statements concerning plaintiff over the internet, which contained the following scandalous, defamatory and libelous statements:

     a.    On or around April 2, 2012, Defendant and his wife sent an e-mail to Plaintiff landlord, Yishai Kedar waging complaints regarding prior three weeks on her "otherwise quiet block."

          i.    In the first week of Plaintiff's operation Donovan reported "Loud noise by drunken customers shouting and screaming and playing music." This was reported by his son to the police;

          ii.    The following week Mr. Donovan alleged encountered someone urinating next to his car;

          iii.    The e-mail went on to state that during "the past weekend (Mr.

Donovan) photographed female customer urinating between cars;"

    iv.    It was further stated without any factual support, "Judging from constant turnover of parked cars during club hours it appears that the clientele of Plaintiff are also engaged in...(the) sale of drugs."

    v.    Any doubt about Mr. Donovan's mindset was erased by the statement that he has had the "satisfying experience" since 1981 "of evicting several nuisance bars." He was particularly enraged by the "...(s)omewhat illegal and sinister operation like Aura." Exhibit Y

b.    On or around August 10, 2012, Defendant made posted the following on Philebrity.com an online magazine:

"Rot in hell, club Aura!! Your kind of operation might have succeeded in the wild and wooly NL [Northern Liberties] about 20 years ago. Why don't you open up at 10th and Butler or in one of the neighborhoods that your 'high class' clientele come from? (BTW [by the way] the sleazy owner of the place, Mark Stein, testified in court that his place was a 'high class Restaurant' that required people 'to wear shoes.' They apparently don't have bathrooms either since their classy clientele uses Fairmount avenue as their bathroom,. I have a picture of a woman squatting between cars in front of my house. I and my neighbors are keeping our fingers crossed that these sleazoids don't find a way to rise again." Exhibit Z

171.    The statements contained in these communications were intended to and did convey to the readers thereof, either directly or by implication, that Plaintiff operates unlawfully and that its patrons are

undesirable.

172.     The statements and charges in the article are false so far as they reflect upon plaintiff's character and reputation.

173.     The plaintiff has never, committed any violations alleged by defendant, nor was he or the club even an accessory to, nor an aider and abettor of, such unlawful acts, nor has he ever been guilty of any other violation of law, but he has at all times been a peaceable and law abiding business operator and inhabitant of the several communities in which he has resided from the day of his birth to the present time.

174.     Defendant knew or should have known that the statements contained in therein and identified in paragraph 170 were false when made, and defendant communicated them either intentionally and maliciously, or with reckless disregard for their truth or falsity, or negligently and carelessly.

175.     The statements were posted, communicated on the dates articulated above, via internet over the world wide web and read by the plaintiff's neighbors, friends and diverse other persons.

176.     By reason of the statements and charges contained in these communications and identified in paragraph 170, the plaintiff has been brought into scandal and reproach, and has been held up to odium, scorn and contempt among his neighbors, business acquaintances, and other good citizens, and is suspected by them to have been guilty of the crimes and fraudulent practices which defendant's article imputed to plaintiff, as a result of which the plaintiff has suffered in his business, his reputation, feelings and peace of mind, to his great financial loss and damage.

THIRTEENTH CLAIM FOR RELIEF

Art. XIV, U.S. Constitution, Discrimination by Interfering with a
Contractual interest 42 U.S.C. § 1981
Plaintiff v. James Brossy

177.    Plaintiff incorporates by reference and realleges paragraphs 1 to 176 of this complaint.

178.    Federal statute, *42 U.S.C. § 1981*, outlaws racial discrimination in the making and enforcing of private contracts. The statute provides that "[a]ll persons... shall have the same right...to make and enforce contracts...as is enjoyed by white citizens." *42 U.S.C. § 1981 (West 2007)*. To prove a *§ 1981* claim, a plaintiff must show that the defendant intended to discriminate on the basis of race, and that the discrimination interfered with a contractual interest. *See, e.g., Denny v. Elizabeth Arden Salons, Inc., 456 F.3d 427, 434 (4th Cir. 2006) (citing cases)*.

179.    Plaintiff target demographic is "upscale urban".  Although the Plaintiff is not a minority his club is patronized by a crowd comprised of minorities, mainly persons of African American or Hispanic heritage.

180.    Defendant, James Brossy, is a neighbor of Plaintiff and member  of the Northern Liberties Neighborhood Association.  He spends a substantial amount of time and exerts disproportionate energy in pursuit of removing Plaintiff from the Northern Liberties neighborhood.

183.    Police are constantly called to the property during business hours.  Defendant and members of the NLNA are filing false reports to the police about Plaintiff and its customers.  Moreover, when officers investigate these calls none of the reports are founded.

184.    Plaintiff's attempts to communicate and associate with defendant, the NLNA neighbors/members and officers have fallen on deaf ears.

185.    As a direct result of the concerted effort of defendant and the NLNA neighbors/members and officers, Plaintiff was and still is unable to operate as it intended to.

FOURTEENTH CLAIM FOR RELIEF

Art. XIV, U.S. Constitution, Discrimination by Interfering with a
Contractual interest 42 U.S.C. § 1981
Plaintiff v. Debbie Rudman

186.    Plaintiff incorporates by reference and realleges paragraphs 1 to 185 of this complaint.

187.    Federal statute, *42 U.S.C. § 1981*, outlaws racial discrimination in the making and enforcing of

private contracts. The statute provides that "[a]ll persons… shall have the same right…to make and

enforce contracts…as is enjoyed by white citizens." *42 U.S.C. § 1981 (West 2007)*. To prove a *§*

*1981* claim, a plaintiff must show that the defendant intended to discriminate on the basis of race, and

that the discrimination interfered with a contractual interest. *See, e.g., Denny v. Elizabeth Arden*

*Salons, Inc., 456 F.3d 427, 434 (4th Cir. 2006) (citing cases)*.

188.    Plaintiff target demographic is "upscale urban". Although the Plaintiff is not a minority his club is

patronized by a crowd comprised of minorities, mainly persons of African American or Hispanic

heritage.

189.    Defendant, Debbie Rudman, is a neighbor of Plaintiff and member of the Northern Liberties

Neighborhood Association. He spends a substantial amount of time and exerts disproportionate energy

in pursuit of removing Plaintiff from the Northern Liberties neighborhood.

190.    Police are constantly called to the property during business hours. Defendant and members of

the NLNA are filing false reports to the police about Plaintiff and its customers. Moreover, when

officers investigate these calls none of the reports are founded.

191.    Plaintiff's attempts to communicate and associate with defendant, the NLNA

neighbors/members and officers have fallen on deaf ears.

192.    As a direct result of the concerted effort of defendant and the NLNA neighbors/members and

officers, Plaintiff was and still is unable to operate as it intended to.

## FIFTEENTH CLAIM FOR RELIEF

State Common Law Claim for Defamation
Plaintiff v. Christopher Sawyer d/b/a Philadelinquincy

193.    Plaintiff incorporates by reference and realleges paragraphs 1 to 192 of this complaint.

194.    A defamation action is based on an individual's right to enjoy a reputation unimpaired by false and defamatory attacks. *Spain v. Vicente, 315 Pa. Super. 135 (1983).* Further it consists of the utterance or publication of defamatory words or written material which tends to blacken a person's reputation and lower him in the estimation of the community; to expose a person to public hatred, contempt, or ridicule; to injure a person in his or her business, profession or office; or to deter third persons from associating or dealing with him. *Sobel v. Wingard, 366 Pa. Super. 482 (1987); Marcone v. Penthouse Int'l Magazine for Men, 754 F.2d 1072 (3d Cir. 1985), cert. denied, 474 U.S. 864, 106 S. Ct. 182 (1985).*

195.    At all times mentioned herein, plaintiff was a law abiding citizen of the Commonwealth of Pennsylvania, who enjoyed the respect, confidence and esteem of his neighbors, as well as of all others in the community, and has never been guilty of any crime, offense or violation of the law which would tend to lessen the respect, confidence and esteem which he has enjoyed, and to which he was entitled.

196.    At all times mentioned herein, defendant owned, managed, controlled, conducted, printed, published, and circulated a certain online blog known as the " Philadelinquency," in the City and County of Philadelphia, Pennsylvania.

197.    At all times mentioned herein, defendant acted or failed to act through its agents, servants or employees who acted for defendant's benefit, under defendant's control, and within the course and

scope of their authority or employment.

198.     On the following dates, the defendant, intending to injure the plaintiff and to deprive him of his

good name, fame, credit and reputation, falsely, maliciously, wickedly and illegally communicated

statements concerning plaintiff over the internet, which contained the following scandalous, defamatory

and libelous statements:

    a.        August 13, 2012 they posted an article titled, "The Candy Stripe Is L&I's Way of

Saying "We Hate You"  Exhibit AA

    b.        August 14, 2012 they posted an article titled,  "Club Aura, Supposed to be Shut

Wednesday, Will Host Fashion Event Thursday" - "Looking at the expected VIPs, other than

Councilman Curtis Jones, it seems like the cream of Philadelphia's B-Listers will be there to

celebrate." Exhibit BB

    c.        August 14, 2012 they posted an article titled,  "Remember Club Aura from earlier

today?" Exhibit CC

    d.        August 17, 2012 they posted an article titled,  "COURT UPDATE – Club Aura: If You

Fuck Up Again, You Will Be Padlocked" Exhibit DD

    e.        September 19, 2012 they posted an article titled, "Get Ready for Mad River II, a/k/a

'Craft And Claw.'" Exhibit EE

    f.        October 9, 2012 they posted an article titled, "Club Rain, Rain Go Away — And

Flying Cheesesteaks - "People got killed there (at Rain). ..Marc Stein, the owner of Rain has

sic'd his attorney on the L&I Review Board hoping to re-open and it will be Club Rain-ing its

terror back on Old City tourists and neighbors...reopening nuisance bars hasn't been getting

better lately, as with the case of the near-death of Club Aura. Posted in The Law and tagged

Aura, nuisance establishments....Summary of video posted online: "...officer returns up Chestnut

and goes off camera on Letitia." Exhibit FF

g.      February 25, 2013 they posted an article titled, "Club Oh We Hate You So Much:

Aura Faces PLCB Hearing Tomorrow" Exhibit GG

h.      February 27, 2013, they posted an article titled, "Northern Liberties Residents Are All

RACISTS" Exhibit HH

199.   The statements contained in these communications were intended to and did convey to the

readers thereof, either directly or by implication, that Plaintiff operates unlawfully and that its patrons are

undesirable.

200.   The statements and charges in the article are false so far as they reflect upon plaintiff's character

and reputation.

201.   The plaintiff has never, committed any violations alleged by defendant, nor was he or the club

ever an accessory to, nor an aider and abettor of, such unlawful acts, nor has he ever been guilty of any

other violation of law, but he has at all times been a peaceable and law abiding business operator and

inhabitant of the several communities in which he has resided from the day of his birth to the present

time.

202.   Defendant knew or should have known that the statements contained in therein and identified in

paragraph 198 were false when made, and defendant communicated them either intentionally and

maliciously, or with reckless disregard for their truth or falsity, or negligently and carelessly.

203.   The statements were posted, communicated on the dates articulated above, via internet over the

world wide web and read by the plaintiff's neighbors, friends and diverse other persons.

204.   By reason of the statements and charges contained in these communications and identified in

paragraph 198, the plaintiff has been brought into scandal and reproach, and has been held up to odium,

scorn and contempt among his neighbors, business acquaintances, and other good citizens, and is

suspected by them to have been guilty of the crimes and fraudulent practices which defendant's article

imputed to plaintiff, as a result of which the plaintiff has suffered in his business, his reputation, feelings

and peace of mind, to his great financial loss and damage.

SIXTEENTH CLAIM FOR RELIEF

State Common Law Claim for Defamation
Plaintiff v. Philebrity

205.   Plaintiff incorporates by reference and realleges paragraphs 1 to 204 of this complaint.

206.   A defamation action is based on an individual's right to enjoy a reputation unimpaired by false

and defamatory attacks. *Spain v. Vicente, 315 Pa. Super. 135 (1983).* Further it consists of the

utterance or publication of defamatory words or written material which tends to blacken a person's

reputation and lower him in the estimation of the community; to expose a person to public hatred,

contempt, or ridicule; to injure a person in his or her business, profession or office; or to deter third

persons from associating or dealing with him. *Sobel v. Wingard, 366 Pa. Super. 482 (1987);*

*Marcone v. Penthouse Int'l Magazine for Men, 754 F.2d 1072 (3d Cir. 1985), cert. denied, 474*

*U.S. 864, 106 S. Ct. 182 (1985).*

207.   At all times mentioned herein, plaintiff was a law abiding citizen of the Commonwealth of

Pennsylvania, who enjoyed the respect, confidence and esteem of his neighbors, as well as of all others

in the community, and has never been guilty of any crime, offense or violation of the law which would

tend to lessen the respect, confidence and esteem which he has enjoyed, and to which he was entitled.

208.   At all times mentioned herein, defendant owned, managed, controlled, conducted, printed, published, and circulated a certain online blog known as the " Philebrity," in the City and County of Philadelphia, Pennsylvania.

209.   At all times mentioned herein, defendant acted or failed to act through its agents, servants or employees who acted for defendant's benefit, under defendant's control, and within the course and scope of their authority or employment.

210.   On the following dates, the defendant, intending to injure the plaintiff and to deprive him of his good name, fame, credit and reputation, falsely, maliciously, wickedly and illegally communicated statements concerning plaintiff over the internet, which contained the following scandalous, defamatory and libelous statements:

a.   April 16, 2012 they posted an article titled, "You can stay in business, but turn that music down" Exhibit II

b.   June 21, 2012 they posted an article titled, "Update: Club Aura, At Long Last, Candy-Striped" and "Fare Thee Well, Club Aura: You Totally Sucked" - "Aura was a piece of shit that had blatant disregard for the community it was supposed to be part of." From Larry Freedman: "I have not seen such a blatant disregard for neighbors and authority by an operator in a long time. I am appalled by their inhuman and uncivilized behavior. They have no intention of fixing the problems of excessive noise, rowdy behavior, etc." Exhibit JJ

c.   June 28, 2012 they posted an article titled, "Update: Club Aura, Can't Stop, Won't Stop (But Should Probably Stop)" posts Aura twitter account and then diverts attention to

@phillyphailures - Where Philly's nightlife goes to die."   Exhibit KK

d.       August 10, 2012 they posted an article titled, "Update: Club Plaintiff, At Long Last,

Candy-Striped" A post addressing this article was written by Judy Gelzinis Donovan

commenting that Plaintiff's clientele should go back to "10th and Butler." Exhibit Z

e.       August 13, 2012 they posted an article titled, "UPDATE: Club Aura Has To Close By

August 15th, Or: Club Aura Plans To Throw Parties Into Late September." Exhibit LL

f.       February 25, 2013 they posted an article titled, " "Club Aura Update: We're still talking

about Club Aura, Unfortunately." Exhibit MM

211.    The statements contained in these communications were intended to and did convey to the

readers thereof, either directly or by implication, that Plaintiff operates unlawfully and that its patrons are

undesirable.

212.    The statements and charges in the article are false so far as they reflect upon plaintiff's character

and reputation.

213.    The plaintiff has never, committed any violations alleged by defendant, nor was he or the club

ever an accessory to, nor an aider and abettor of, such unlawful acts, nor has he ever been guilty of any

other violation of law, but he has at all times been a peaceable and law abiding business operator and

inhabitant of the several communities in which he has resided from the day of his birth to the present

time.

214.    Defendant knew or should have known that the statements contained in therein and identified in

paragraph 210 were false when made, and defendant communicated them either intentionally and

maliciously, or with reckless disregard for their truth or falsity, or negligently and carelessly.

215.    The statements were posted, communicated on the dates articulated above, via internet over the world wide web and read by the plaintiff's neighbors, friends and diverse other persons.

216.    By reason of the statements and charges contained in these communications and identified in paragraph 210, the plaintiff has been brought into scandal and reproach, and has been held up to odium, scorn and contempt among his neighbors, business acquaintances, and other good citizens, and is suspected by them to have been guilty of the crimes and fraudulent practices which defendant's article imputed to plaintiff, as a result of which the plaintiff has suffered in his business, his reputation, feelings and peace of mind, to his great financial loss and damage.

SEVENTEENTH CLAIM FOR RELIEF

State Common Law Claim for Defamation
Plaintiff v. Northernliberties.org

217.    Plaintiff incorporates by reference and realleges paragraphs 1 to 215 of this complaint.

218.    A defamation action is based on an individual's right to enjoy a reputation unimpaired by false and defamatory attacks. *Spain v. Vicente, 315 Pa. Super. 135 (1983)*.  Further it consists of the utterance or publication of defamatory words or written material which tends to blacken a person's reputation and lower him in the estimation of the community; to expose a person to public hatred, contempt, or ridicule; to injure a person in his or her business, profession or office; or to deter third persons from associating or dealing with him.  *Sobel v. Wingard, 366 Pa. Super. 482 (1987); Marcone v. Penthouse Int'l Magazine for Men, 754 F.2d 1072 (3d Cir. 1985), cert. denied, 474 U.S. 864, 106 S. Ct. 182 (1985).*

219.    At all times mentioned herein, plaintiff was a law abiding citizen of the Commonwealth of Pennsylvania, who enjoyed the respect, confidence and esteem of his neighbors, as well as of all others

in the community, and has never been guilty of any crime, offense or violation of the law which would

tend to lessen the respect, confidence and esteem which he has enjoyed, and to which he was entitled.

220.    At all times mentioned herein, defendant owned, managed, controlled, conducted, printed,

published, and circulated a certain online blog known as the " northernliberties.org," in City and County

of Philadelphia, Pennsylvania.

221.    At all times mentioned herein, defendant acted or failed to act through its agents, servants or

employees who acted for defendant's benefit, under defendant's control, and within the course and

scope of their authority or employment.

222.    Defendant, Northernliberties.org, is a communication forum and information hub for the

Northern Liberties Community and those interested in said community.

223.    Defendant has a disclaimer on the website stating that, "It is our hope that this website can be a

place to discuss the comings and goings of our neighborhood; a forum to dialogue about the events and

affairs that shape our common future and a platform for us to reaffirm our love for this community.

Personal attacks will not be tolerated anywhere on this site."

224.    Defendant has wrongfully interfered with the business operations of Plaintiff and served as a

conduit of defamatory and harmful remarks through Defendant's message board, which is entirely open

to the public.

225.    On the following dates, the defendant, intending to injure the plaintiff and to deprive him of his

good name, fame, credit and reputation, falsely, maliciously, wickedly and illegally communicated

statements concerning plaintiff over the internet, which contained the following scandalous, defamatory

and libelous statements:

a.      August 27, 2012 they following was posted, August 27, 2012 - NorthernLiberties.org -

Jay: "I saw...the bouncers wearing GUNS! WTF is going on in that place...?

Arctic Splash: Club Aura is under a court order to provide inside and outside security

Jay: But..WHY (does) Aura need armed guards. Is there any other bar or Restaurant or club in

the neighborhood that needs bouncers with guns?

Arctic Splash: I agree with you - bouncers with guns at clubs just doesn't seem like a delectable

cocktail...

Chris: The answer is their clientele, some of whom may be armed and/or leave a gun in the car,

in case they get disrespected and need to settle some business

Mythaeus: Presence of armed guards can be effective determined... Exhibit NN

b.      August 28, 2012 there was a post from defendant, David Witz stating, "I never saw

armed security at Metro or 2nd Street Annies, which were both in the space Aura now

occupies. If they think they need guns it's because of the situation they themselves created by

opening this unlicensed dance club and nuisance bar on the corner of Front and Fairmount.

Aura's management and landlord have shown nothing but contempt for the police, the

neighborhood and the neighbors, and I can only hope their bad behavior gets them padlocked

before somebody gets shot."  Exhibit OO

c.      October 4, 2012 defendant posted an article titled, "Club Aura loses another club."

"Club Aura's sister nightmare in Old City, Dreemz aka Rain, has finally been shut down by the

city." "The owner...is Marc Stein...I can only hope his getting caught and shut down in Old City

means the...neighbors of Aura may finally get some relief from this toxic, unlicensed dance club.

Exhibit Q

d.      Defendant posted an article stating,   "Hey, L&L... The same people who own Aura have been up to the same BS in Old City for a decade, operating the same type of crappy business, ruining their neighbors' lives and failing to obtain any of the required permits.  At least one person has died, and there's been a shooting. Why don't you come check out Rain/Dreemz?"  Exhibit PP

226.    The statements contained in these communications were intended to and did convey to the readers thereof, either directly or by implication, that Plaintiff operates unlawfully and that its patrons are undesirable.

227.    The statements and charges in the article are false so far as they reflect upon plaintiff's character and reputation.

228.    The plaintiff has never, committed any violations alleged by defendant, nor was he or the club ever an accessory to, nor an aider and abettor of, such unlawful acts, nor has he ever been guilty of any other violation of law, but he has at all times been a peaceable and law abiding business operator and inhabitant of the several communities in which he has resided from the day of his birth to the present time.

229.    Defendant knew or should have known that the statements contained in therein and identified in paragraph 225 were false when made, and defendant communicated them either intentionally and maliciously, or with reckless disregard for their truth or falsity, or negligently and carelessly.

230.    The statements were posted, communicated on the dates articulated above, via internet over the world wide web and read by the plaintiff's neighbors, friends and diverse other persons.

231.   By reason of the statements and charges contained in these communications and identified in

paragraph 225, the plaintiff has been brought into scandal and reproach, and has been held up to odium,

scorn and contempt among his neighbors, business acquaintances, and other good citizens, and is

suspected by them to have been guilty of the crimes and fraudulent practices which defendant's article

imputed to plaintiff, as a result of which the plaintiff has suffered in his business, his reputation, feelings

and peace of mind, to his great financial loss and damage..

EIGHTEENTH CLAIM FOR RELIEF

State Common Law Claim for Tortious Interference with Business
Plaintiff v. All Defendants

232.   Plaintiff incorporates by reference and realleges paragraphs 1 to 231 of this complaint.

233.   By and through all individual and collective acts as heretofore described defendants have

wrongly and maliciously interfered with the plaintiff's business operations and interests and have

deprived, and/or sought to deprive, plaintiff of its ability to conduct normal and lawful business and to

generate revenue.

234.   Plaintiff has therefore been caused to sustain business and revenue losses as have been

described in greater particularity in paragraph 59, *supra*.

REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully request that the Court:

1.   Award compensatory damages in an amount to be determined according to proof by Plaintiff

against all Defendants in their individual capacities;

2.   Award punitive damages in such other amount as the jury may determine constitutional

violations alleged in this complaint;

234.   Plaintiff has therefore been caused to sustain business and revenue losses as have been
described in greater particularity in paragraph 59, *supra*.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully request that the Court:

1.   Award compensatory damages in an amount to be determined according to proof by
Plaintiff against all Defendants in their individual capacities;

2.   Award punitive damages in such other amount as the jury may determine constitutional
violations alleged in this complaint;

3.   Award Plaintiff costs, expenses, and reasonable attorneys' fees pursuant to inter alia, 42
U.S.C.A. § 1988 and other federal and state laws; and

4.   Grant such other further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rules of Civil Procedure, Rule 38(b), and local Rule 48.1, Plaintiff
demands trial by jury for all of the issue pled so triable.

Respectfully submitted,

ROACH, LEITE & MANYIN, LLC

Dated: 8/9/2013                    By: _____
                                        Marirose Roach, Esquire
                                        Attorneys for Plaintiff

## VERIFICATION

On August 8, 2013, Marc Stein, personally appeared before me, the undersigned

Notary Public, and, after being duly sworn, he stated under oath that he is the plaintiff in

this action; that he has read the complaint; and that every statement contained in the

complaint is within his personal knowledge and is true and correct.

_____
Marc Stein

SUBSCRIBED AND SWORN TO BEFORE ME on August 8, 2013, which I certify by
my signature and official seal as set out below.

[Notary Seal]

_____
Notary Public

```
NOTARIAL SEAL
PARTHEN YVES ANTY
Notary Public
ABINGTON TWP., MONTGOMERY COUNTY
My Commission Expires Mar 18, 2014
```